## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JUAN MITCHELL, *individually and on behalf of Jovon Mitchell, deceased*, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 4:23-cv-00223-MTS |
| SAINT LOUIS COUNTY, *et al.*, | ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on three pending Motions to Dismiss.  *See* Docs. [39], [40], & [42].  In the Motions, groups of Defendants collectively seek dismissal of all the claims against them in Plaintiff's Third Amended Complaint.  Having reviewed the Third Amended Complaint in its entirety along with all the briefing on these three Motions, the Court will grant the Motions in part and dismiss the claims in this action arising under federal law.  In light of the dismissal of all the claims over which the Court has original jurisdiction, the Court will decline to exercise supplemental jurisdiction over the claims arising under Missouri law.  The Court therefore will dismiss those state law claims without prejudice.

## I.    Background

On December 23, 2019, while incarcerated as a pretrial detainee in the St. Louis County jail, Jovon Mitchell became ill.  Though he had been a "previously healthy 31-year-old man," just days after first falling ill, Jovon Mitchell died.  Doc. [36] ¶ 2.  His brother,

Plaintiff Juan Mitchell,[1] brings this action individually and on behalf of Jovon Mitchell ("Decedent"), against eight individual Defendants[2] and St. Louis County for violations of Decedent's "Constitutional rights to receive adequate medical care under the Fourteenth Amendment (Count I)," "two counts under theories of municipal liability ('*Monell*') under the Fourteenth Amendment, for repeated and systemic failures to train, supervise, and/or discipline (Count II) and for maintaining unconstitutional policies, practices, and customs (Count III), all three counts cognizable pursuant to 42 U.S.C. §§ 1983 and 1988." Doc. [36] ¶ 7. Plaintiff also brings claims under Missouri state law for wrongful death (Count IV), medical negligence (Count V), and negligence (Count VI). *Id.* All Defendants have moved to dismiss the claims against them in their entirety. *See* Doc. [39] (Motion of Defendants St. Louis County and Banasco); Doc. [40] (Motion of Defendants Parker, Heitman, Reynolds, Howard, and Cora); Doc. [42] (Motion of Defendant Doucette).[3]

## II.    Standard

In order to state a claim for relief, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." The purpose of such a motion is

---

[1] Plaintiff has shown sufficiently for this stage that he has standing to bring this action. He is a class two survivor of Decedent under Missouri law and has plausibly shown that no class one survivor is entitled to bring the action. *See* Mo. Rev. Stat. § 537.080; *see also Pedroli v. Mo. Pac. R.R.*, 524 S.W.2d 882, 885–86 (Mo. Ct. App. 1975); *Andrews v. Neer*, 253 F.3d 1052, 1064 (8th Cir. 2001).

[2] The individual Defendants are Emily Doucette, Director of St. Louis County's Department of Public Health; Raul Banasco, Director of St. Louis County's Justice Services; Sean McMahan, Corrections Officer; Todd Parker, Physician Assistant; Connie Heitman, Nurse; Vicki Reynolds, Nurse; Shyla Howard, Nurse; and Katie Cora, Nurse.

[3] The Court previously dismissed this action as to Defendant Sean McMahan who is now deceased. *See* Doc. [79]; *see also* Fed. R. Civ. P. 25(a).

to test the legal sufficiency of a complaint.  When considering a Rule 12(b)(6) motion, the Court assumes a complaint's well-pleaded factual allegations are true and makes all reasonable inferences in favor of the nonmoving party, but the Court "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts."  *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).  To survive a motion to dismiss, the complaint must allege facts supporting each element of the plaintiff's claims, and the claims cannot rest on mere speculation.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The complaint "must allege more than '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements'" and instead must "allege sufficient facts that, taken as true, 'state a claim to relief that is plausible on its face.'"  *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The plausibility of a complaint turns on whether the facts alleged allow a court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).  When a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III.      Facts

Decedent began vomiting and having "a terrible headache" on December 23, 2019 while awaiting trial in St. Louis County jail on criminal charges.  Doc. [36] ¶ 25.  Though

- 3 -

multiple other unnamed detainees told unnamed "corrections personnel" about Decedent's symptoms, Plaintiff does not allege that anyone from the medical unit became aware of Decedent's symptoms until about 1:29 p.m. on December 24, when Decedent had an "encounter" with Nurse Shatia Reece, who is not a party to this action. *Id.* ¶¶ 34, 39. Nurse Reece did not provide Decedent "with any treatment." *Id.* ¶ 39. However, Nurse Reece contacted Defendant Parker, a physician assistant, by phone to report Decedent's condition. PA Parker ordered 12.5 mg of promethazine for Decedent and instructed that Decedent should have his vital signs taken for two days and should increase his water intake. PA Parker also instructed that "any abnormalities with vitals" or any new "complaints" be reported to the on-call medical provider. *Id.* ¶ 41.

Later that evening, and again that night, Decedent's "vitals were taken"[4] in accordance with PA Parker's order. *Id.* ¶ 52. Decedent reported vomiting again, and "he was given" Tylenol in response to a body temperature of 99.5 degrees. *Id.* ¶ 53. At around 4:00 a.m. the following morning, either Decedent or his cellmate activated the emergency call button in their cell. Thirteen minutes later, Defendant Nurse Heitman reported to the housing unit with two corrections officers. Nurse Heitman recorded Decedent's symptoms as "'bad headache' 'throbbing in the forehead,' nausea, vomiting, difficulty standing, and complaints of inability to eat all day." *Id.* ¶ 63. Nurse Heitman did not record Decedent's blood pressure, did not record that he had an unsteady gait, did not transfer him to the

---

[4] In some places, mostly where it works to his advantage, Plaintiff wrote his Third Amended Complaint in passive voice. *See, e.g.*, Doc. [36] ¶ 52 ("vitals were taken"); *id.* ¶ 53 ("he was given Tylenol"); *id.* ¶ 90 ("Mitchell was taken in a wheelchair"). As a result, the Third Amended Complaint at times obscures who is providing Decedent medical care.

infirmary, and did not contact PA Parker.  Nurse Heitman did, though, provide Decedent Tylenol.

At around 6:00 a.m., Decedent or his cellmate again activated the emergency call button complaining of Decedent's "same and worsening symptoms."  *Id.* ¶ 71.  A corrections officer contacted Nurse Heitman who told the officer that Decedent "would have to wait for the morning nurse and leave his unit and walk out to see the diabetic nurse during the morning medication rounds."  *Id.* ¶ 72.  Later that same hour, Decedent, unable to walk on his own, received assistance from other inmates, who eventually carried him to meet the diabetic nurse, Defendant Nurse Reynolds.  Decedent waited fifteen minutes while Nurse Reynolds dispensed medications to other inmates.  Nurse Reynolds then assessed Decedent and noted in her report about Decedent's headache, vomiting, feeling faint, and his "very dry" mouth, lips, and tongue.  *Id.* ¶ 77.  Nurse Reynolds "contacted" PA Parker but "took no further immediate action" to treat Decedent.  *Id.* ¶ 78.  At around 10:30 a.m., Decedent again saw Nurse Reynolds at a medication round.  This time, she noted his "unsteady gait."  *Id.* ¶ 85.  She "again" talked to PA Parker, and, this time, Decedent "was to be sent to the infirmary."  *Id.* ¶ 86.  Nevertheless, it was not until around 12:41 p.m. that Decedent "was actually transferred to the infirmary."  *Id.* ¶¶ 87, 90.

Defendant Nurse Howard worked as the infirmary nurse that day.  She recorded that upon Decedent's arrival he was reporting a throbbing headache and vomiting.  She observed that he had slurred speech along with a dry tongue and lips.  In addition, a urinalysis was indicative of dehydration.[5]  Nurse Howard reported her observations and Decedent's symptoms to PA Parker who ordered orthostatic blood pressure tests and "suggested" that

---

[5] Decedent's medical records do not indicate that Nurse Howard took Decedent's vital signs.

Nurse Howard start an intravenous line at 150 milliliters per hour for a total of two liters "if [Decedent] was unable to drink enough or hold it in." *Id.* ¶ 95. Nurse Howard did not administer intravenous fluids to Decedent but provided him a cup of water. Decedent—who recall had been transferred to the infirmary at 12:41 p.m.—then underwent the orthostatic blood pressure tests at 1:16 p.m., 2:15 p.m., 2:18 p.m., and 2:21 p.m. The tests showed a high of 155 over 91. Decedent was placed in his own cell within the infirmary.

At about 4:00 p.m., corrections officer Sean McMahan brought dinner to inmates in the infirmary. Decedent "couldn't eat a meal," and it "was collected uneaten" fifteen minutes later. *Id.* ¶ 101. At 5:14 p.m., McMahan toured the infirmary. This time, McMahan "observed" Decedent "laying on the floor, with his head against the door." *Id.* ¶ 102. Decedent "was unresponsive." *Id.* McMahan "slowly continued his rounds, spoke with another inmate, and then spent more time at the nursing station." *Id.* ¶ 103.

Defendant Nurse Cora went to Decedent's cell and found he was not breathing and had an oxygen saturation level of eight percent. Nurse Cora "called a 'Code 1.'" *Id.* ¶ 106. She placed Decedent on his side due to all the secretions coming from his nose and mouth, and she attempted to use the infirmary's suction equipment to clear Decedent's airway. It malfunctioned. Nurse Cora then attempted to use a "rebreather and/or oxygen tank," but that equipment "either failed or the oxygen tank(s) were empty." *Id.* ¶ 113. After "[s]everal more minutes," additional nurses arrived "with a functional oxygen tank." *Id.* ¶ 115. By the time Clayton EMS arrived at the infirmary, Decedent was not breathing and had no pulse. EMS initiated CPR and Decedent's pulse "re-started." *Id.* ¶ 119.

EMS transported Decedent to St. Mary's hospital. When he arrived, he was unresponsive to light and had no response to painful stimuli. A brain scan indicated he had

an approximately three centimeter mass of blood in his head.  He was transported to Saint Louis University hospital where doctors "officially pronounced [him] brain dead" on December 27.  *Id.* ¶ 125.  The Office of the St. Louis County Medical Examiner examined Decedent and discovered he had a left cerebellar hemorrhage.  Decedent's cause of death was a stroke.

IV.     **Discussion**

        a.  *Count I*

In Count I of Plaintiff's action, he alleges that four nurses (Defendants Heitman, Reynolds, Howard, and Cora) and the physician assistant (Defendant Parker) involved in Decedent's care all violated Decedent's rights under the Eighth and Fourteenth Amendments of the United States Constitution by showing a deliberate indifference to Decedent's serious medical needs.  The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  The Supreme Court has explained that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's ban on cruel and unusual punishments.  *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  While the Eighth Amendment does not govern the treatment of pretrial detainees like Decedent, the Eighth Amendment's deliberate indifference standard applies to pretrial detainees through the Fourteenth Amendment.  *Hartsfield v. Colburn*, 371 F.3d 454, 456–57 (8th Cir. 2004); *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009).  The question in Count I, then, is whether any of these five Defendants were deliberately indifferent to Decedent's serious medical needs.  The Court determines Plaintiff's Third Amended Complaint does not plausibly plead that any of these Defendants showed deliberate indifference to Decedent's serious medical need.

"[D]eliberate indifference is a difficult standard to meet." *Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 360 (8th Cir. 2023) (quoting *Spencer v. Knapheide Truck Equip., Co.*, 183 F.3d 902, 906 (8th Cir. 1999)). "It requires an official to consciously disregard a known and 'objectively serious medical need.'" *Id.* (quoting *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011)). A serious medical need is one diagnosed by a physician or one "so obvious that even a layman would recognize [it]." *Id.* (citation omitted); *accord Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) ("To be objectively serious, a medical need must have been diagnosed by a physician as requiring treatment or must be so obvious that even a layperson would easily recognize the necessity for a doctor's attention." (internal quotations omitted)). The disregard for the serious medical need must rise to the level of criminal recklessness. *Jackson*, 756 F.3d at 1066; *accord Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993) ("[D]eliberate indifference requires a highly culpable state of mind approaching actual intent.").

Since a government official "is only liable for his . . . own misconduct," *Whitson v. Stone County Jail*, 602 F.3d 920, 928 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 677), the Court must examine each Defendant's own realizations and own actions (or inactions) to determine whether he or she violated Decedent's rights. That means Plaintiff must have pleaded facts that plausibly show that each Defendant both "recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *See Krout*, 583 F.3d at 567. At times, Plaintiff's Third Amended Complaint fails to appreciate this individuality requirement. *See, e.g.*, Doc. [36] ¶ 184 ("Defendants were aware . . . .");

*id.* ¶ 188 ("Defendants knew . . . ."); *id.* ¶ 190 ("Defendants should have been aware . . . .").[6] Where Plaintiff actually alleges facts specific to each of the four Nurse Defendants and PA Parker, they do not show that any of these Defendants both recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk.

A stroke or brain hemorrhage constitutes a serious medical condition. *See Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002). And merely giving acetaminophen to a prisoner that a caregiver knew to be having a stroke, and doing nothing else, would plead a claim of deliberate indifference. That is not what the facts Plaintiff alleges show. Here, no physician diagnosed Decedent with a serious condition. The question, then, is whether Decedent's medical need was so obvious that even a layman would have recognized it. That determination "cannot be analyzed in a vacuum." *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008). Rather, "prison officials' background knowledge is part of the analysis." *Id.*

Here, Plaintiff does not allege that Decedent had any underlying health issues. To the contrary, Plaintiff alleges Decedent was "a previously healthy 31-year-old man." Doc. [36] ¶ 2. It was not obvious that an otherwise-healthy 31-year-old experiencing a bout of vomiting along with a headache and dizziness, or even unsteadiness, was having a stroke. *See Roberts v. Kopel*, 917 F.3d 1039, 1043 (8th Cir. 2019) (finding a lack of treatment of inmate who reported vomiting, dizziness, headaches, and numbness, which "medical

---

[6] In grouping all Defendants together, Plaintiff at times makes, putting it charitably, imprecise representations to the Court. For example, he alleges "Defendants were aware of [Decedent's] condition beginning on or about December 23, 2019." *Id.* ¶ 184. But there are absolutely no factual allegations in the lengthy Third Amended Complaint that indicate that Nurse Reynolds, for example, knew anything about Decedent's condition (or even that she should have known) on December 23 or 24.

professionals believe[d] to be consistent with the flu" but that was actually a stroke, might have been negligent but was "not deliberately indifferent to an obvious need for immediate medical attention that [wa]s sufficient to establish a cognizable claim under the Eighth Amendment"); *Jones*, 512 F.3d at 482 (finding that being "unable to stand or walk" and being "'google-eyed' and unresponsive" were "not a sufficiently obvious medical issue"); *cf. Robinson*, 292 F.3d at 564 (noting plaintiff's risk of stroke "was substantial" due to his hypertension, which defendants knew of). There is nothing in Plaintiff's Third Amended Complaint that plausibly pleads that these Defendants "actually knew" Decedent was having a stroke or otherwise knew how serious Decedent's condition was. *See Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014); *see also Jones*, 512 F.3d at 483 ("A medical condition is not *per se* obvious to a layperson because it later results in death.").

What was clear was that Plaintiff was unwell. But Plaintiff's allegations show that all five of the Defendants named in Count I were concerned about, responded to, and provided care for Decedent. *See, e.g.*, Doc. [36] ¶¶ 41, 62, 64, 86, 95, 97, 99. "[T]his is not one of those cases in which there was a complete and unjustifiable lack of treatment." *See Leonard*, 59 F.4th at 361. Nor is it a case of "intentional maltreatment." *Dulany v. Carnahan*, 132 F.3d 1234, 1240–41 (8th Cir.1997). Plaintiff understandably has "disagreement[s] with [the] treatment decisions" these Defendants made for his brother, but that "does not rise to the level of a constitutional violation." *Est. of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). So, even though, as pleaded, some of these Defendants may have "made an unreasonable judgment call under the circumstances," that is "insufficient to establish a constitutional violation." *See Krout*, 583 F.3d at 570; *accord Jackson*, 756 F.3d at 1065–66 (explaining that merely showing a prison medical provider committed "medical malpractice

is insufficient to establish deliberate indifference").  After all, "section 1983 d[id] not turn the Fourteenth Amendment into a font of tort law that supersedes the tort systems already available under individual state laws." *Gregory v. City of Rogers*, 974 F.2d 1006, 1009 (8th Cir. 1992) (en banc).

In sum, based on the facts pleaded in the Third Amended Complaint, it is not plausible that any of these Defendants actually *knew* Decedent was having a stroke—or some other serious medical event—and provided "intentional maltreatment" or otherwise "refus[ed] to provide essential care." *Dulany*, 132 F.3d at 1240–41.  Though perhaps some of the medical decisions were unreasonable or violated standards of care under state law, these Defendants' treatment of Decedent "d[id] not represent cruel and unusual punishment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976).

b.  *Count II*

Plaintiff calls Count II of his Third Amended Complaint "Failure to Train, Supervise, and Discipline ('Monell liability') in violation of the Fourteenth Amendment to the U.S. Constitution, Cognizable Under 42 U.S.C. § 1983."  He brings it against Defendants St. Louis County, Doucette, Parker, and Banasco.[7]  These Defendants, Plaintiff alleges, "were aware that previous pretrial detainees . . . who had symptoms of similar severity to [Decedent] . . . had suffered injuries and death because of ongoing failures to train, supervise, and discipline County employees . . . ."  Doc. [36] ¶ 31.

It is difficult to unpack Count II.  Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from a deliberately indifferent failure to

---

[7] Plaintiff brings his federal claims against Defendants in their individual capacities.  *See* Doc. [36] ¶¶ 7, 13–21; *but see id.* ¶ 1 (stating Defendants "are sued in their individual and official capacities").

train or supervise. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  That would be municipal liability, a form of entity liability. *McGrath v. Scott*, 250 F. Supp. 2d 1218, 1222 (D. Ariz. 2003).  Entity liability, however, differs from supervisory liability as a form of personal liability. *Id.*; *see also Thomas v. Stanek*, 2:14-cv-01415, 2015 WL 757574, at *12 (W.D. Pa. Feb. 23, 2015) (noting plaintiff's "flawed assumption that supervisory liability and municipal liability are one and the same").  "[W]hen supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987).  So, when Plaintiff names both St. Louis County and Defendants in their individual capacity in this Count and calls it "Monell liability," the Court is somewhat at a loss on how to proceed.[8] *See Barnes v. City of El Paso*, 677 F. Supp. 3d 594, 619 (W.D. Tex. 2023) (noting "individual-capacity supervisory liability claims differ from *Monell* claims"); *Martin v. Warren Cnty.*, 799 F. App'x 329, 341 (6th Cir. 2020) (construing claim as one "premised upon entity liability pursuant to *Monell*" though plaintiff framed it "as one for supervisory liability").

Complicating things further, the theory of liability Plaintiff advances on Count II in his briefing on the Motions to Dismiss diverges from his theory on Count II in the Third Amended Complaint itself.  In his briefing, for example, Plaintiff asserts that he "is bringing his claims against Defendant Parker . . . as a direct participant in the violations of

---

[8] Confounding the matter even more, Plaintiff "incorporate[d]" every single allegation "made in each preceding paragraph" into this Count.  Doc. [36] ¶ 197; *see also Arch Energy, L.C. v. City of Brentwood*, 4:22-cv-00499-MTS, 2022 WL 4464758, at *2, n.1 (E.D. Mo. Sept. 26, 2022) (explaining that when a complaint "incorporate[s] its multifarious other claims into another vague claim," it "becomes impossible to determine" what each claim asserts).

[Decedent's] constitutional rights." Doc. [54] at 13. That, though, is the exact claim he brought against Parker in Count I. *See, e.g.*, Doc. [36] ¶ 187. Count II alleges issues with Parker's failure to train and supervise others. *Id.* ¶¶ 216–17. And if Parker "was personally or directly involved in the constitutional violation" as Count I alleges, but which Plaintiff now says Count II also alleges, "there is no need to resort to a supervisory liability theory to link [him] to the constitutional violation." *Clay*, 815 F.2d at 1170 (citing *Rollins v. Farmer*, 731 F.2d 533, 535 (8th Cir. 1984)); *cf. Cole v. Does*, 571 F. Supp. 3d 1033, 1042 (D. Minn. 2021) ("A failure to supervise an officer who commits a constitutional violation is not the same thing as being personally involved in that constitutional violation.").

In any event, putting these complications aside, the Court concludes that Count II fails because Plaintiff has not pleaded any underlying constitutional violation.[9] *See Bloodworth v. Kansas City Bd. of Police Comm'rs*, 89 F.4th 614, 628 (8th Cir. 2023) (explaining that "there can be no § 1983 supervisor liability" when there are no "claims of constitutional violations"); *see also* Eighth Circuit Model Jury Instruction § 4.47 Supervisory Liability—Failure to Train or Supervise (providing that a plaintiff must prove that a subordinate "acting under the defendant's supervision violated the plaintiff's constitutional

---

[9] As best the Court can tell, the only possible exception is Officer McMahan "slowly continu[ing] his rounds" after he observed Decedent "unresponsive," "laying on the floor" of the infirmary cell. Doc. [36] ¶¶ 102, 103. Assuming without deciding that Officer McMahan's "fail[ure] to take any immediate action" amounted to deliberate indifference, there are no facts alleged in the Third Amended Complaint that plausibly show that Officer McMahan's failure directly resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise. *See Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013). To establish that, Plaintiff needed to plead facts that show "that, through its deliberate conduct, the [County] was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). The Court concludes that even if Officer McMahan violated Decedent's constitutional rights, the Third Amended Complaint does not show "a direct causal link" with this deprivation of rights and any policy, custom, or a failure to train or supervise. *See id.*

rights" and "as a direct result, the Plaintiff was injured").  Since Decedent "suffered no constitutional injury at the hands of the individual [officials]," the fact that supervisors or policies might have authorized the use of constitutional, albeit second-rate, medical care is "quite beside the point."  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *cf. Hines v. Anderson*, 547 F.3d 915, 922 (8th Cir. 2008) (noting the Eighth Amendment does not guarantee "medical care commensurate with that enjoyed by civilian populations").

### c.  *Count III*

Count III fails for the same reason Count II fails.  Plaintiff's *Monell* claim requires a showing of a constitutional violation by a municipal employee.  *City of Los Angeles*, 475 U.S. at 799; *Meier v. St. Louis*, 934 F.3d 824, 829 (8th Cir. 2019) (explaining municipal liability requires a constitutional violation by a municipal employee).

### d.  *Supplemental Jurisdiction*

Since the Court has determined that Defendants are entitled to dismissal of the claims against them arising under federal law, the Court now will determine whether to retain or decline jurisdiction over the remaining claims in this case, which all arise under Missouri law.  *See* 28 U.S.C. § 1367(c)(3).  Plaintiff's state law claims are before the Court based on supplemental jurisdiction under 28 U.S.C. § 1367(a), which provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  When supplemental jurisdiction over a claim exists under § 1367(a), a district court may decline to

exercise supplemental jurisdiction when, like here, the court has dismissed all claims over which it has original jurisdiction. § 1367(c)(3).

A district court's decision to exercise supplemental jurisdiction in cases with this posture is "purely discretionary." *Carlsbad Tech., Inc. v. HIF BIO, Inc.*, 556 U.S. 635, 639 (2009). But, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Barstad v. Murray Cnty.*, 420 F.3d 880, 888 (8th Cir. 2005) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *accord Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 749 (8th Cir. 2009).

Finding no factor that distinguishes this case from the usual case in which all federal-law claims are eliminated before trial, the Court declines to exercise supplemental jurisdiction over the remaining claims in this case under 28 U.S.C. § 1367(c)(3). *See, e.g.*, *Bhattacharya v. Bd. of Regents of Se. Mo. State Univ.*, 1:22-cv-00043-MTS, 2022 WL 17844457, at *10–11 (E.D. Mo. Dec. 22, 2022). The Court therefore will dismiss these state law claims without prejudice.[10]

## V.    Conclusion

For these reasons, the Court will grant the Motions to Dismiss in part, dismissing all the claims in this action arising under federal law. Because the Court declines to exercise supplemental jurisdiction over the remaining state law claims, the Court will deny the Motions without prejudice in all other respects.

---

[10] In declining to exercise supplemental jurisdiction over the remaining claims arising under Missouri law the Court expresses no opinion on the unaddressed grounds of Defendants' Motions to Dismiss, which the Court denies without prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants St. Louis County and Raul Banasco's Motion to Dismiss, Doc. [39], is **GRANTED** in part and **DENIED** without prejudice in part.

**IT IS FURTHER ORDERED** that Defendants Katie Cora, Connie Heitman, Shyla Howard, Todd Parker, and Vicki Reynolds's Motion to Dismiss, Doc. [40], is **GRANTED** in part and **DENIED** without prejudice in part.

**IT IS FINALLY ORDERED** that Defendant Emily Doucette's Motion to Dismiss, Doc. [42], is **GRANTED** in part and **DENIED** without prejudice in part.

A separate Order of Dismissal will be entered herewith.

Dated this 18th day of April 2024.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE