IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JUAN MITCHELL, Individually and on behalf of JOVON MITCHELL, deceased | ) | |
| Plaintiff, | ) | 4:23-cv-00223-MTS |
| v. | ) | |
| ST. LOUIS COUNTY, et al., | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS TODD PARKER, CONNIEHEITMAN, VICKI REYNOLDS, SHYLA HOWARD, AND KATIE CORA'S PARTIAL MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT**

Plaintiff Juan Mitchell, individually and on behalf of Jovon Mitchell, deceased, submits this Memorandum in Opposition to Defendants Todd Parker, Connie Heitman, Vicki Reynolds, Shyla Howard, and Katie Cora's *Partial* Motion to Dismiss *Counts IV and V* (Medical Negligence and Wrongful Death) of Plaintiff's Third Amended Complaint ("TAC").

**STATEMENT OF FACTS**

Mr. Mitchell was a 31-year-old pretrial detainee at the St. Louis County Jail. Plaintiff's TAC alleges that on or about December 23, 2019, he began suffering a stroke, developed a terrible headache, and began vomiting. TAC ¶¶ 22, 25. On December 24, 2019, Mr. Mitchell awoke telling his cellmate his head hurt badly. Id. ¶ 26. His roommate and other detainees repeatedly reported that he was ill, vomiting, dizzy, unable to stand, and unable to walk. Id. ¶¶ 27-31, 35-37. Mr. Mitchell was so sick that when his brother came to visit on Christmas Eve, jail staff recorded that he was "unable to get up" to see his family. Id. ¶¶ 32-34.

That afternoon, practical nurse Shatia Reece saw Mr. Mitchell, documented vomiting, nausea, and dizziness, and contacted Defendant Parker by phone. Id. ¶¶ 39-40. Parker ordered

Promethazine and directed that nursing obtain vital signs "q shift for 2 days," increase water intake, and report "any abnormalities with vitals or new pt complaints to the on call medical provider." Id. ¶ 41. Yet, despite those orders, Mr. Mitchell was never taken to the infirmary on December 24 and was never examined by a physician. Id. ¶ 42. Throughout that day and evening, he remained unable to stand for count, but correctional officers did not properly record or report that fact. Id. ¶¶ 43-47, 55.

By the night of December 24 into the early morning of December 25, Mr. Mitchell's condition had worsened dramatically. His cellmate reported hypersensitivity to light and sound, severe head pain, inability to speak at times, slurred speech, stumbling, and pleas to go to the hospital. Id. ¶¶ 56-61. At approximately 4:05 a.m., Mr. Mitchell or his cellmate pressed the emergency button and reported the "worst headache of his life," dizziness, and inability to walk. Id. ¶¶ 58-60. Plaintiff alleges that Corrections Medicine had a standing order signed by Doucette requiring that if a patient complained of the "worst headache of their life," a doctor was to be contacted immediately. Id. ¶ 60.

At approximately 4:18 a.m., Defendant Heitman came to Mr. Mitchell's housing unit. Id. ¶ 62. Heitman recorded a "bad headache," "throbbing in the forehead," nausea, vomiting, difficulty standing, and inability to eat. Id. ¶ 63. But she did not transfer Mr. Mitchell to the infirmary, did not contact a provider or Parker, and instead merely gave him Tylenol. Id. ¶ 64. fMr. Mitchell's gait was unsteady; that his cellmate tried to give Heitman additional details about his vomiting, difficulty standing, walking, and speaking; that Heitman refused to listen; that she failed to record his blood pressure even though policy and standing orders required it; and that a correctional officer present observed slurred speech and Mr. Mitchell pleading to be taken to the infirmary. Id. ¶¶ 65-71. Even then, Heitman did not send

him to the hospital or infirmary and, upon information and belief, ignored orders requiring her to contact the on-call provider regarding slurred speech, inability to talk, and difficulty walking. Id. ¶ 71. A few hours later, around 6:00 a.m. on Christmas morning, Mr. Mitchell or his roommate again pushed the emergency button because of the same worsening symptoms. Id. ¶ 72. Heitman told a correctional officer that Mitchell would have to wait for the morning nurse and walk out to see the diabetic nurse during medication rounds. Id. ¶ 73. Jail video allegedly showed that by 6:50 a.m. Mitchell could not walk under his own power, had to be assisted by other inmates, used the walls to hold himself up, slid down onto the floor, and lay there for approximately ten minutes. Id. ¶¶ 74-75.

At around 7:00 a.m., inmates helped Mitchell to see Defendant Reynolds, and he then waited roughly fifteen minutes while Reynolds dispensed medication to other inmates. Id. ¶ 76. At approximately 7:15 a.m., Reynolds assessed him and documented even more serious and escalating symptoms: headache, vomiting, very dry mouth, dry lips, dry tongue, and his statement that he felt he was going to pass out. Id. ¶ 77. Reynolds took no further immediate action to treat Mitchell or send him to the hospital or the infirmary and instead sent him back to his cell. Id. ¶ 78. Reynolds admitted she delayed treatment or infirmary transfer to because of suspected faking or malingering. Id. ¶ 79.

Later that morning, at approximately 10:30 a.m., Reynolds again noted Mitchell had an "unsteady gait" and wrote that she spoke to Parker "again" and that Mitchell was to be sent to the infirmary. Id. ¶¶ 85-86. Even so, several more hours of delay passed between the Reynolds-Parker determination that Mitchell needed the infirmary and his actual transfer. Id. ¶ 87. At approximately 12:36 p.m., Mr. Mitchell was told to leave his cell without assistance and

meet transport; video showed him stumbling, staggering, and holding onto the wall before he was finally taken in a wheelchair to the infirmary at 12:41 p.m. Id. ¶¶ 88-90.

Upon his arrival at the infirmary, Defendant Howard conducted the intake encounter. Id. ¶ 92. Howard noted a throbbing headache, vomiting, slurred speech, dry tongue, dry and cracked lips, and urinalysis indicative of dehydration. Id. Despite those symptoms, including slurred speech as a classic sign of stroke, Howard did not call 911 and did not escalate his care. Id. ¶ 93. No vital signs were taken or recorded at the 12:41 p.m. infirmary intake. Id. ¶ 94. Howard reported the symptoms to Parker, who ordered orthostatic blood pressures and suggested an IV at 150 ml/hr for a total of 2 liters if Mr. Mitchell could not drink enough or hold it down. Id. ¶ 95. But no IV fluids were administered. Id. ¶ 96. Although blood pressure testing later showed readings escalating to as high as 155/91, Howard did nothing to address the escalating blood pressure or otherwise treat Mitchell. Id. ¶¶ 97-98. After the last or Mr. Mitchell was locked alone in a cell and no nurse or corrections-medicine staff observed him again for about three hours, despite orders to observe fluid intake or administer IV fluids. Id. ¶ 99.

At approximately 5:14 p.m., Defendant McMahan observed Mr. Mitchell unresponsive on the floor of his infirmary cell. Id. ¶¶ 102-104. When Defendant Cora then went to check on Mr. Mitchell, he was not breathing and had an oxygen saturation as low as 8%. Id. ¶ 105. Cora called a "Code 1," but did not initiate CPR and did not immediately call or direct someone to call 911 or Clayton EMS. Id. ¶¶ 106-109. Instead, several minutes elapsed before anyone called 911. Id. ¶ 109. Cora reported secretions from Mr. Mitchell's mouth and nose, but when she attempted to use the suction equipment it malfunctioned. Id. ¶¶ 111-112. When she attempted to use a rebreather and/or oxygen tank, that equipment also failed. Id. ¶ 113. By the time EMS got there at approximately 5:25 p.m., Mr. Mitchell had no pulse. Id. ¶¶ 115-116. Before EMS arrived, no

corrections-medicine staff performed mouth-to-mouth resuscitation or chest compressions. Id. ¶ 117. CPR began only when EMS arrived. Id. ¶ 118. Mr. Mitchell later was declared brain dead and died of a stroke. Id. ¶¶ 119, 125-126.

Defendants Heitman, Reynolds, and Howard observed and reported vomiting, slurred speech, problems walking, and unsteady gait over a period of roughly thirteen hours without taking emergency action, including calling 911. Id. ¶ 132. Parker stated that if Mr. Mitchell was having difficulty with ambulation, he might need to go to the hospital, yet Mitchell was not sent even after later reports confirmed difficulty ambulating. Id. ¶ 133. Heitman, Reynolds, and Howard violated Parker's direct orders and standing orders. Id. ¶ 134.

*Count IV* alleges the medical defendants owed Mr. Mitchell a duty to use the degree of skill and learning ordinarily used under similar circumstances by members of the medical profession; that they breached that duty in multiple specific ways, including failing to monitor blood pressure, report and record worsening symptoms, transfer him to the infirmary, timely treat dehydration and hypertension, timely call EMS, perform CPR, respond appropriately to urgent situations, maintain emergency equipment, and transport him to the hospital when he presented with unsteady gait and slurred speech; and that those breaches directly and proximately caused delay and denial of diagnosis and treatment, causing severe pain, emotional distress, and death. Id. ¶¶ 233-243. *Count V* likewise alleges Defendants owed a duty to ensure the safety and basic welfare of detainees, including proper medical care; that Defendants' conduct violated that duty; and that, as a direct and proximate result, Mr. Mitchell was deprived of potentially life-saving care, experienced conscious pain and suffering, and lost his life. Id. ¶¶ 244-249.

## ARGUMENT

### A. Legal Standard

To survive a Rule 12(b)(6) motion, a complaint need only contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In applying that standard, the Court must accept Plaintiff's Complaint's factual allegations as true and draw all reasonable inferences in Plaintiff's favor. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014). Rule 8 does not require Plaintiff to prove his case in their complaint, and dismissal is improper where the pleaded facts give defendants fair notice of the claims and the grounds on which they rest. *Id.* at 848-49.

### B. Counts IV and V Are Not Barred by Official Immunity

Defendants first argue that Counts IV and V are barred because they are public employees entitled to official immunity. That argument fails because Plaintiff's TAC alleges failures to perform ministerial duties and bad faith. As an initial matter, official immunity determinations are often fact intensive and rarely appropriate for resolution on the pleadings. *Davis v. Lambert–St. Louis Int'l Airport*, 193 S.W.3d 760, 763 (Mo. banc 2006). Here, Plaintiff alleges nonperformance of required medical tasks and violation of direct and standing physician orders, both of which are ministerial. That distinction alone defeats dismissal at Rule 12. And, in Defendant's Motion to Dismiss, Defendants cite to *Simmons v. Hemeyer* 2007 U.S. Dist. Lexis 7750, 1-2 (W.D. Mo. 2007) in support of official immunity, however *Simmons* was decided at summary judgment <u>after</u> factual development on the duties owed, a critical distinction.

Under Missouri law, official immunity protects public employees from liability for alleged acts of negligence committed during the course of their official duties only when those acts are

discretionary. *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. banc 2008). It does not apply when a public official fails to perform a ministerial duty required by law or acts in bad faith in the performance or nonperformance of a discretionary duty.

Plaintiff's Third Amended Complaint alleges failures to perform fixed, mandatory tasks. Defendant Heitman failed to record blood pressure despite standing orders requiring it and failed to contact a provider after Mitchell reported the "worst headache of his life." TAC ¶¶ 60, 69, 71. Defendant Reynolds documented escalating symptoms but sent Mitchell back to his cell and delayed escalation because she wanted to see whether he was "faking or malingering." Id. ¶¶ 77–79. Defendant Howard observed slurred speech and dehydration but failed to take vital signs at infirmary intake, failed to call 911, and failed to administer ordered IV fluids. Id. ¶¶ 92–96. Defendant Cora encountered a patient who was not breathing yet did not initiate CPR and did not ensure an immediate 911 call. Id. ¶¶ 105–109, 117. Those allegations describe failures to perform required acts, not protected discretionary judgment. See *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 446 (Mo. banc 1986) (official immunity does not apply to ministerial duties); *Letterman v. Does*, 859 S.W.2d 746, 750 (Mo. App. E.D. 1993) (no official immunity where employees failed to follow mandatory procedures triggered by specific facts).

State official immunity cannot be extended to shield licensed medical professionals performing ordinary patient care. In *State ex rel. Eli Lilly & Co. v. Gaertner*, the court held that "the defendant physicians are not public officials entitled to immunity but are employees subject to suit in which their liability for medical malpractice may or may not be established." 619 S.W.2d 761, 764 (Mo. App. E.D. 1981). The court explained that official immunity protects only discretionary governmental decisions that "go to the essence of governing," not professional medical judgments. Id. at 765. The same reasoning applies to licensed nurses. Plaintiff alleges

Defendants were performing bedside clinical duties, taking vital signs, reporting critical symptoms, following standing orders, escalating stroke symptoms, initiating CPR, and securing emergency transport. TAC ¶¶ 60, 69, 71, 77–79, 92–99, 105–109, 117, 132–134. Those are professional medical tasks that are ministerial in nature. *Gaertner* applies to Defendant Parker, a licensed physician's assistant and to Defendant jail nurses Heitman, Reynolds, Howard, and Cora for the same reason they are acting in a licensed professional medical capacity, not sovereign functions. Providing total immunity from negligence to medical actors in the public sector and depriving the same from medical actors in the private sector would be an absurd result and far from the foundations of official immunity protecting split second decisions of police officers.

Additionally, Plaintiff pleads specific facts supporting the *bad faith exception* to official immunity for discretionary acts. Plaintiff alleges Reynolds deliberately delayed treatment because she wanted to determine whether Mitchell was "faking or malingering," despite obvious neurological distress. TAC ¶ 79. Plaintiff further alleges that when Heitman responded to the housing unit, Mitchell's cellmate attempted to explain that Mitchell had been vomiting, could not walk, had difficulty speaking, and was getting worse, but Heitman refused to listen and failed to report those symptoms or contact a provider. Id. ¶¶ 66–71. Later that same morning, when the emergency call button was again pressed because Mitchell's condition had worsened, Heitman refused to return to the unit and instead told staff Mitchell would have to wait for the morning nurse and walk out to meet with them during medication rounds, even though he could not walk. Id. ¶¶ 72–73. Moreover, the Plaintiff's complaint alleges Cora encountered Mitchell unresponsive and not breathing yet failed to initiate CPR and failed to ensure an immediate 911 call. Id. ¶¶ 105–109, 117. Taken together, these allegations plausibly support a finding that Defendants acted in

bad faith and consciously disregarded an obvious and escalating medical emergency, which is sufficient to defeat official immunity at the pleading stage.

Parker ordered that nursing obtain vital signs every shift for two days and report any abnormal vitals or new patient complaints to the on-call medical provider. TAC ¶ 41. Plaintiff alleges that Heitman failed to record blood pressure despite policy and standing orders requiring it. Id. ¶ 69. Additionally, Plaintiff alleges that Heitman failed to apprise Parker or another provider of new and alarming symptoms, including stumbling, unsteady gait, slurred speech, and inability to talk. Id. ¶¶ 66, 71. Howard failed to take or record vital signs at the infirmary intake. Id. ¶ 94. Those are not allegations merely that the nurses exercised poor discretion in choosing among reasonable alternatives. Rather, these are allegations that they failed to carry out required basic ministerial duties and/or acted in bad faith.

Plaintiff alleges Corrections Medicine had a standing order requiring immediate doctor contact if a patient complained of the "worst headache of [his] life." Id. ¶ 60. It further alleges that despite that standing order, and despite Parker's instruction to report new complaints, Heitman neither contacted a provider nor sent Mr. Mitchell to the infirmary or hospital after he reported the worst headache of his life, dizziness, inability to walk, slurred speech, and worsening condition. Id. ¶¶ 58-71. Again, that is the nonperformance of a prescribed step, not merely the exercise of protected discretion, and even if so, noncompliance was done in bad faith.

Plaintiff alleges Reynolds documented escalating symptoms, spoke to Parker "again," noted an unsteady gait, and recorded that Mitchell was to be sent to the infirmary, but nevertheless delayed treatment decisions because she claimed to suspect faking or malingering. Id. ¶¶ 77-87. Plaintiff alleges Howard observed slurred speech, dehydration, cracked lips, dry tongue, and vomiting, yet did not call 911 or otherwise escalate care. Id. ¶¶ 92- 99. It alleges Cora encountered

an unresponsive, nonbreathing patient with oxygen saturation as low as 8%, did not initiate CPR, and did not ensure an immediate 911 call. Id. ¶¶ 105-109, 117. Those allegations, taken as true, concern failures to perform mandatory emergency response and escalation steps in the face of obvious medical crisis. Plaintiff's theory here is not merely that the nurses and Parker exercised bad clinical judgment. It is that they failed to do things they were required to do: take vital signs including blood pressure readings, report new and/or concerning symptoms to the provider, follow standing orders, timely transfer critical detainees like Mitchell for higher-level care, timely summon EMS, initiate CPR, and ensure critical emergency equipment was functional. TAC ¶¶ 41, 60, 66, 69, 71, 87, 93-99, 105-117, 132-134, 236. At a minimum, whether those duties were ministerial or discretionary cannot be resolved against Plaintiff based on the well-pleaded allegations in Plaintiff's complaint.

Plaintiff alleges Parker was notified that Mr. Mitchell was vomiting, nauseated, dizzy, and worsening, and that Parker ordered vitals every shift for two days and directed nursing to report "any abnormalities with vitals or new pt complaints to the on call medical provider." TAC ¶ 41 see also TAC ¶¶ 40, 78, 86, 95-98, 133-134. Plaintiff alleges Heitman documented a "bad headache," forehead throbbing, nausea, vomiting, and difficulty standing, yet failed to record blood pressure, failed to contact Parker or another provider, failed to transfer Mr. Mitchell to the infirmary, and ignored reports of slurred speech and inability to walk. TAC ¶¶ 63-71 , 73.

Plaintiff alleges Howard observed slurred speech, dehydration, cracked lips, and dry tongue, failed to call 911, failed to take or record intake vitals, received orders for orthostatic blood pressures and IV fluids, failed to administer those IV fluids, and then left Mr. Mitchell alone in the infirmary for hours. TAC ¶¶ 92-99. Plaintiff alleges Cora encountered Mitchell when he was not breathing, failed to initiate CPR, failed to ensure an immediate 911 call, and then confronted

malfunctioning suction and oxygen equipment while no one provided rescue breathing or chest compressions before EMS arrived. TAC ¶¶ 105-117. Plaintiff's allegations describe failures in ministerial emergency protocols, not protected discretionary policy choices. At minimum, whether those failures were discretionary or ministerial cannot be resolved against Plaintiff on a motion to dismiss.

The public duty doctrine warrant dismissal either. Plaintiff alleges duties owed directly to Mr. Mitchell as an individually identified patient receiving medical care, not generalized duties owed to the public at large. TAC ¶¶ 41, 60, 63-71, 77-79, 85-99, 105-118, 233-237, 245-247. Count IV pleads a patient-provider relationship and the applicable professional duty. Id. ¶ 233. Count V pleads a duty to ensure Mr. Mitchell's safety and provide proper medical care to maintain his health. Id. ¶ 245.

In conclusion, Defendants seek to convert every negligent act by a publicly employed jail nurse or provider into an immune discretionary function simply because the care occurred in a jail. Missouri law does not go that far. Counts IV and V are not barred on the face of Plaintiff's complaint and dismissal on immunity should be denied.

### C. Plausible Claim for Relief

Defendants' failure to state a claim argument should be denied. Counts IV and V expressly incorporate the preceding factual allegations, and those allegations are detailed and fact specific as to each defendant. TAC ¶¶ 232, 244 [incorporation]; see also TAC ¶ 233 [provider relationship], ¶ 236(a)-(k) [breaches], ¶ 237 [causation], ¶¶ 245-249 [wrongful death damages]. See also, Plaintiff's Statement of Facts. When Plaintiff's painstaking and detailed allegations are incorporated, Counts IV and V plainly state claims for negligence and wrongful death. Defendants'

motion attacks the form of the counts while ignoring the substance of the allegations. Read as a whole, Plaintiff gives each moving Defendant fair notice of the claims against them.

**D. Defendant Reynolds**

The point is even clearer as to Defendant Reynolds. Defendants' assertion that Plaintiff's complaint contains no allegations directed to her is flatly contradicted. TAC ¶¶ 76-79, 85-87. Plaintiff also alleges Reynolds reported vomiting, slurred speech, problems walking, and unsteady gait over a *thirteen-hour period* without taking emergency action, and that Reynolds violated Parker's direct orders and standing orders. TAC ¶¶ 132-134. To the extent this Court prefers further clarification of the allegations against Defendant Reynolds within Count IV and V, or merger of the two counts into a single wrongful death count, Plaintiff seeks leave to do so.

**CONCLUSION**

Plaintiff alleges, in factual detail, the actions and inactions of Defendants Parker, Heitman, Reynolds, Howard, and Cora. Plaintiff's allegations plausibly state claims for medical negligence and wrongful death and preclude dismissal on official immunity grounds because Plaintiff's alleges ministerial failures and bad faith. Plaintiff respectfully requests that the Court deny Defendants' Partial Motion to Dismiss Counts IV and V in its entirety. In the alternative, if the Court concludes any clarification is required, Plaintiff requests leave to amend.

Dated: March 16, 2026

Respectfully submitted,

Mark J. Pedroli, MBE 50787
***PEDROLI LAW, LLC***

7777 Bonhomme Ave, Suite 2100
Clayton, Missouri 63105
314.669.1817
314.785.7400 Fax
Mark@PedroliLaw.com

Certificate of Service

The undersigned hereby certifies that, on the above date, a true and accurate copy of the foregoing was filed electronically with the Clerk of this Court, through the Court's electronic filing system, and thereby served on counsel of record for all parties.

/s/ Mark Pedroli